WILLIAM H. NEWMAN (*appearing pro hac vice*)
TARA Q. HIGGINS (*appearing pro hac vice*)
**WILL NEWMAN LAWYER PLLC**
33 Nassau Avenue, Second Floor
Brooklyn, NY 11222
Telephone:  718.218.3360
*will@willnewmanlawyer.com*
*tara@willnewmanlawyer.com*

Attorneys for Plaintiffs
NEWTON AC/DC FUND L.P., PATAGON MANAGEMENT, LLC
SCALLION TRADING LTD.

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Newton AC/DC Fund, L.P., Patagon Management LLC, and Scallion Trading Ltd., on behalf of all other similarly situated Plaintiffs, <br><br>         Plaintiffs, <br><br>   v. <br><br> Maxim Ermilov, <br><br>         Defendant, <br><br>     and <br><br> Circle Internet Financial, LLC, <br><br>         Relief Defendant. | Civil Action No. 5:26-cv-05055-PCP |

### PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

FACTUAL BACKGROUND.........................................................................................................1

    A.    Ermilov Made an Agreement With Investors to Sell OVN ...........................................2

    B.    Ermilov Breached the Agreement and Stole Treasury Assets ......................................3

    C.    Ermilov Tried to Hide Assets in the Zama Platform ....................................................5

    D.    Ermilov Temporarily Reversed Transfer to Zama-Circle Wallet to Gain Credibility ...5

ARGUMENT ................................................................................................................................5

    I.    This Court Has Authority to Issue a Preliminary Injunction in This Case.......................6

    A.    *Grupo Mexicano* Does Not Apply to Fraudulent Conveyance Claims .........................6

    B.    *Grupo Mexicano* Does Not Apply to Specific Assets .....................................................7

    II.    The Plaintiffs Meet the Requirements for a Preliminary Injunction ...............................7

    A.    The Plaintiffs Are Likely to Succeed on the Merits .........................................................8

        1.    Fraudulent Transfer ....................................................................................................8

        2.    Breach of Contract ...................................................................................................10

    B.    The Plaintiffs Will Suffer Irreparable Harm Absent Relief.........................................10

    C.    The Balance of Equities Favors a Preliminary Injunction ...........................................12

    D.    Public Interest Favors a Preliminary Injunction...........................................................12

    III.    This Court Should Not Require the Named Plaintiffs to Post a Bond ........................13

CONCLUSION............................................................................................................................14

**TABLE OF AUTHORITIES**

**Cases**

*Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)..................................8

*Astrove v. Doe*, 2022 U.S. Dist. LEXIS 129067 (S.D. Fla. June 17, 2022) ..............................13

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) .......................................................15

*Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers*,
  584 F.2d 308 (9th Cir. 1978) ..................................................................................................9

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003)..........15

*Fed. Trade Comm'n v. Dluca*,
  2018 U.S. Dist. LEXIS 237844 (S.D. Fla. Feb. 28, 2018), *report and recommendation
  adopted*, 2018 U.S. Dist. LEXIS 238558 (S.D. Fla. Mar. 12, 2018).......................................13

*Fid. Nat'l Title Ins. Co. v. Castle*, 2011 U.S. Dist. LEXIS 135316 (N.D. Cal. Nov. 23, 2011) 12

*Filip v. Bucurenciu*, 129 Cal. App. 4th 825 (Cal. Ct. App. 2005) ...............................................9

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999) .....................6, 7

*Heissenberg v. Doe*, 2021 U.S. Dist. LEXIS 257218 (S.D. Fla. Apr. 22, 2021) .......................12

*Jacobo v. Doe*, 2022 U.S. Dist. LEXIS 101504 (E.D. Cal. June 7, 2022) ....................12, 14, 15

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)..................................................................6

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003).................................................................15

*Koller v. Brown*, 224 F. Supp. 3d 871 (N.D. Cal. 2016)..........................................................8, 9

*Kremen v. Cohen*, 2011 U.S. Dist. LEXIS 141273 (N.D. Cal. Dec. 7, 2011) .............................7

*Lagemann v. Spence*, 2019 U.S. Dist. LEXIS 171887 (S.D.N.Y. Jan. 24, 2019).....................12

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011)...................................................................9

*Lo v. Lee*, 24 Cal. App. 5th 1065 (Cal. Ct. App. 2018) .................................................................9

*Perez v. Wolf*, 445 F. Supp. 3d 275 (N.D. Cal. 2020) ..................................................................8

*Potter v. All. United Ins. Co.*, 37 Cal. App. 5th 894 (Cal. Ct. App. 2019) ................................10

*Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077 (9th Cir. 2004) .............................6, 7

*Sanger v. Ahe Ahn*, 2019 U.S. Dist. LEXIS 178473 (N.D. Cal. Oct. 15, 2019)........................10

*Smith v. Wells Fargo Bank, N.A.*, 809 F. Supp. 3d 922 (N.D. Cal. 2025)..................................11

*United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489 (4th Cir. 1999)....................7

*Univ. of Tex. v. Camenisch*,  451 U.S. 390 (1981)......................................................................8

*Wimbledon Fund, SPC (Class TT) v. Graybox, LLC*,
  2015 U.S. Dist. LEXIS 134966 (C.D. Cal. Sept. 29, 2015)......................................................6

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ....................................................................................8

**Statutes**

Cal. Civ. Code § 3439.01(b)...........................................................................................................9

Cal. Civ. Code § 3439.04 ...............................................................................................................8

Cal. Civ. Code § 3439.07(a)(3)(A)..................................................................................................9

**INTRODUCTION**

Plaintiffs Newton AC/DC Fund, L.P. (the "Fund"), Patagon Management LLC ("Patagon"), Scallion Trading Ltd. ("Scallion," and together with the Fund and Patagon, the "Named Plaintiffs"), submit this memorandum of law in support of their renewed motion for a preliminary injunction. This memorandum cites the declaration of Eric S. Meyer, dated June 5, 2026 (the "Meyer Decl.").

**FACTUAL BACKGROUND**

The Named Plaintiffs move for a preliminary injunctive order, preventing Ermilov from moving or transferring the digital assets currently held in the cryptocurrency wallets identified in Paragraph 9 of the Meyer Decl.

Ermilov stole millions of dollars' worth of digital assets from investors. Meyer Decl. ¶ 12. In doing so, he breached an agreement he made with them in which he promised to distribute assets to investors who acquired a certain amount of a cryptocurrency he created. *Id.* ¶ 6. The Named Plaintiffs performed their part of the agreement and purchased over 55,000 of those tokens. *Id.* ¶ 10. Instead of honoring his end of the bargain, however, Ermilov absconded with over $15.77 million in funds. *Id.* ¶ 12.

Upon information and belief, Ermilov resides in Russia. *Id.* ¶ 3. He resided in Russia as recently as late 2021 and has claimed on social media to reside in Abu Dhabi, United Arab Emirates. *Id.* Ermilov has demonstrated an imminent intent to dissipate or hide the funds belonging to the Named Plaintiffs and similarly situated class members (i.e. OVN token holders or "Investors") by depositing them in a cryptocurrency service that uses encryption to shield transaction details. *Id.*

Court intervention is therefore necessary to prevent Ermilov from dissipating any assets belonging to the Investors. *Id.* ¶ 4.

1

A.    Ermilov Made an Agreement With Investors to Sell OVN

Ermilov created a cryptocurrency platform called Overnight Finance (the "Platform"). Meyer Decl. ¶ 5. The Platform allowed users to invest in various cryptocurrencies in a manner similar to buying shares in a money market mutual fund. *Id.*

Ermilov also created OVN, a cryptocurrency. *Id.* ¶ 6. He promoted and sold OVN tokens by expressly promising that purchasers would obtain rights to control the profits generated by the Platform, which he held in certain cryptocurrency wallets (collectively, the "Treasury"), including to direct a distribution of those profits. *Id.* In particular, he promised that OVN tokens were "governance" tokens that conferred upon purchasers the right to vote on what to do with Treasury assets. *Id.*

On November 6, 2024, Ermilov wrote on Discord that, "you can buy 51% of OVNs and vote to have [the Treasury] distributed." *Id.* ¶ 7.

Ermilov made other statements consistent with the representation that OVN tokens were worth a share of the Treasury. *Id.* ¶ 8. For example, on April 10, 2024, he wrote, "Sustainable growth of [the Treasury] is the only way for us to keep growing OVN price," meaning that growth in the Treasury was correlated with a corresponding increase in the price of OVN tokens. *Id*.

Upon information and belief, Ermilov authored an X thread on November 28, 2023, from the official Overnight Finance X account, that stated: "In summary: OVN is a governance token of the Overnight ecosystem that provides real value for OVN holders. . . . It's backed by protocol revenue and has mechanics to increase demand and buying pressure." *Id*. ¶ 9.

Ermilov was also clear what assets were included in the Treasury. *Id*. ¶ 10. He referred to it as "POL" or "protocol owned liquidity." *Id.* This refers in the cryptocurrency industry to the assets a cryptocurrency platform maintains for transactions with users. *Id.* For the

2

Overnight Finance protocol, Ermilov disclosed, through his statements and actions, that the Treasury assets were held in the following wallets (the "Treasury Wallets"):

- 0x898137400867603e6d713cbd40881dd0c79e47cb;

- 0xf02d9f19060ee2dd50047dc6e1e9ebac9ba436fe;

- 0x784cf4b62655486b405eb76731885cc9ed56f42f;

- 0xe497285e466227f4e8648209e34b465daa1f90a0; and

- 0x9030d5c596d636eefc8f0ad7b2788ae7e9ef3d46.

*Id*. The last three of these addresses were explicitly listed as "Treasury Addresses" in a funding application submitted by Ermilov to the Arbitrum Foundation in March 2024. *Id.*

The Plaintiffs purchased OVN tokens in the manner Ermilov designed: using the Platform's automated trading accounts (which are called "liquidity pools" in the cryptocurrency industry) that Ermilov himself substantially seeded and owned. *Id.* ¶ 11. Specifically, Ermilov deployed a smart contract, a computer program stored on a blockchain which can also hold cryptocurrency, on each of the Base and Optimism blockchains on September 19 and 20, 2023, with the addresses 0x61366A4e6b1DB1b85DD701f2f4BFa275EF271197 and 0x844d7d2fca6786be7de6721aabdff6957ace73a0, respectively. *Id.* Ermilov deposited approximately 23,000 of the total supply of 1 million OVN tokens into the two smart contracts. *Id.* The Named Plaintiffs together used these smart contracts to purchase over 55,000 OVN tokens, which is over 5.5% of all OVN tokens in existence. *Id.*

**B.**    Ermilov Breached the Agreement and Stole Treasury Assets

The Plaintiffs as a class own the vast majority of OVN tokens, over 91%. Some class members participated in a vote on May 4, 2026, to distribute the Treasury assets (the "Proposal"). Meyer Decl. ¶ 12. By early morning on May 11, 2026, Pacific Time, holders of more than half of the outstanding amount of OVN tokens had voted in favor of the Proposal,

with no votes against. *Id.* The voting period closed on June 3, 2026, successfully passing the Proposal. *Id.*

In response to the vote, Ermilov repudiated his previous representations that the Investors could vote to distribute the Treasury to themselves on a pro rata basis. Just before the vote crossed the 50% threshold on May 11, 2026, Ermilov removed a substantial portion of the assets from the Treasury Wallets (the "May 11 Removals"). *Id.* ¶ 13. In all, Ermilov moved over $15.77 million in assets out of the Treasury Wallets into a newly created wallet (the "New Wallet"). *Id.* Of these assets, roughly $14 million were bridged to the Ethereum blockchain, and the vast majority of those assets were deposited in three separate smart contracts deployed and managed by the Zama protocol, which were designed to enhance secrecy and allow for confidential transfers to other wallets. *Id.* One of these Zama smart contracts (the "Zama-Circle Wallet") received a deposit of approximately 12.5 million USDC tokens from the New Wallet. *Id.* The second of these Zama smart contracts (the "Zama-Tether Wallet") received a deposit of approximately 91,000 USDT tokens from the New Wallet. *Id.* The third of these Zama smart contracts (the "Zama-ETH Wallet," and together with the Zama-Circle Wallet and the Zama-Tether Wallet, the "Zama Wallets") received a deposit of approximately 20.32 WETH tokens (approximately $47,500 of market value at the time) from the New Wallet. *Id.*

Ermilov acknowledged the Investors' entitlement to the funds and his misconduct. *Id.* ¶ 14. Ermilov spoke to the Investors' entitlement in a May 14, 2026, Discord post, writing that, "a group of people took control of 50+% of OVNs, so they control the protocol now." *Id.* In the same post, he admitted that he only "told [Investors] to get to 51%" to "drive the price [of OVN tokens] up to 7-10 USD." *Id.* But now that Investors had done so, Ermilov stated that Investors are not entitled to the Treasury assets. *Id.*

4

**C.**     Ermilov Tried to Hide Assets in the Zama Platform

Ermilov's transfers to the Zama Wallets frustrate the Investors' ability to trace the digital assets in which they have an interest.  Meyer Decl. ¶ 15.  Once assets have been transferred to one of the Zama Wallets, a user may conduct confidential transfers within the Zama protocol that hide the recipient and amount of the transfer.  *Id.*  The Named Plaintiffs were able to trace the Treasury assets within the Zama-Circle Wallet only due to the lack of third-party activity and minimal net deposits of less than 114,000 USDC (of which 97,000 USDC was deposited in one transaction by Zama itself) prior to Ermilov's transfer of about 12.5 million USDC tokens. *Id.*  The Named Plaintiffs are unable to trace the Treasury assets within the Zama-Tether Wallet and Zama-ETH Wallet because there were far more deposits in them prior to Ermilov's transfers and there has been far more third-party activity in them since.  *Id.*

**D.**     Ermilov Temporarily Reversed Transfer to Zama-Circle Wallet to Gain Credibility

After the Named Plaintiffs sought and obtained a temporary restraining order from this Court, Ermilov agreed to temporarily reverse the May 11 Removals by depositing those assets into the Treasury Wallets and the New Wallet and to refrain from any further transfers of Treasury Wallets and New Wallet assets pending the outcome of a preliminary injunction motion.  Meyer Decl. ¶ 16.

**ARGUMENT**

The Court should grant the Named Plaintiffs' proposed preliminary injunction, prohibiting Ermilov from transferring assets from the Treasury Wallets and the New Wallet pending the resolution of this action.  It should do so to prevent Ermilov from absconding with the Investors' assets and to ensure that those assets do not disappear forever.

Courts grant this relief when plaintiffs assert fraudulent conveyance claims and seek the return of a specific asset.  They also grant this relief in cryptocurrency matters when a bad actor

wrongfully maintains custody of a plaintiff's assets because it is necessary for the plaintiff to avoid irreparable harm. Since the Named Plaintiffs assert a fraudulent conveyance claim arising from a cryptocurrency dispute, the relief is similarly appropriate here.

## I.    This Court Has Authority to Issue a Preliminary Injunction in This Case

### A.    *Grupo Mexicano* Does Not Apply to Fraudulent Conveyance Claims

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund* does not prohibit a preliminary injunction in this case since the Named Plaintiffs assert a fraudulent conveyance claim. 527 U.S. 308 (1999). The Ninth Circuit has held that where a plaintiff "alleges fraudulent conveyance or other equitable causes of action, *Grupo Mexicano* does not bar the issuance of a preliminary injunction freezing assets." *Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004); *see Wimbledon Fund, SPC (Class TT) v. Graybox, LLC*, 2015 U.S. Dist. LEXIS 134966, *15 (C.D. Cal. Sept. 29, 2015) ("the Ninth Circuit has held that *Grupo Mexicano* does not prevent a court from issuing a preliminary injunction freezing assets where a fraudulent-transfer claim is asserted.")

Granting injunctions to address fraudulent conveyance is consistent with the principle that a district court may freeze assets "where there is a likelihood of dissipation of the claimed assets, or the inability to recover monetary damages, if relief is not granted." *Wimbledon Fund*, 2015 U.S. Dist. LEXIS 134966 at *15 (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)); *see also In re Focus Media*, 387 F.3d at 1085 (upholding asset-freezing preliminary injunction where there was "substantial evidence that assets were being dissipated"); *Kremen v. Cohen*, 2011 U.S. Dist. LEXIS 141273, *19 (N.D. Cal. Dec. 7, 2011) (issuing asset-freezing preliminary injunction where "there is an appreciable risk that defendants" will dissipate assets). Accordingly, this Court has authority to issue the requested injunction.

Here, the Plaintiffs assert a fraudulent conveyance claim. Accordingly, *Grupo Mexicano* does not bar injunctive relief.

**B.**     *Grupo Mexicano* Does Not Apply to Specific Assets

While *Grupo Mexicano* limits restraints in cases seeking money damages, that limit does not prevent a restraint "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant." *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999).

Here, the Plaintiffs seek to restrain specific cryptocurrency tokens that rightfully belong to them and that Ermilov fraudulently conveyed. *Grupo Mexicano* therefore does not bar injunctive relief as to those assets.

**II.     The Plaintiffs Meet the Requirements for a Preliminary Injunction**

To obtain a preliminary injunction, plaintiffs must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Perez v. Wolf*, 445 F. Supp. 3d 275, 292 (N.D. Cal. 2020) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

The Ninth Circuit also applies the "serious questions" test in its approach to preliminary injunctions. *See Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under the serious questions test, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

**A.**    The Plaintiffs Are Likely to Succeed on the Merits

To satisfy the element of success on the merits, a plaintiff need not prove its case in full, nor show that it is more likely than not to prevail.  *Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016) (citing *Univ. of Tex. v. Camenisch*,  451 U.S. 390, 395 (1981) and *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011)).  "Instead, [it] must demonstrate 'a fair chance of success on the merits' or raise questions 'serious enough to require litigation.'"  *Koller*, 224 F. Supp. 3d at 875 (quoting *Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978)).  The Ninth Circuit describes the "difference between the two formulations [as] insignificant."  *Benda*, 584 F.2d at 315.  Here, the Plaintiffs raise questions serious enough to require litigation.

**1.**    *Fraudulent Transfer*

Under the California Uniform Voidable Transfers Act ("UVTA"), "a transfer of assets made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer, if the debtor made the transfer [ ] with an actual intent to hinder, delay or defraud any creditor. … "  *Lo v. Lee*, 24 Cal. App. 5th 1065, 1071 (Cal. Ct. App. 2018) (citations omitted); *see* Cal. Civ. Code §§ 3439.04(a)(1).

"Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer."  *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (Cal. Ct. App. 2005).  Courts consider a number of factors as indicating the "badges of fraud," which the California Legislature codified in 2005 in the UVTA.  *Id.*; *see* Cal. Civ. Code § 3439.04(b).  These factors include whether the transfer was made to an insider; whether the transferee retained possession or control after the transfer; whether the transfer was disclosed or concealed; whether the transfer involved substantially all the debtor's assets; whether the debtor removed or concealed assets; and whether the transfer

occurred shortly before or shortly after a substantial debt was incurred.  *See* Cal. Civ. Code § 3439.04(b).

California courts have held that "a plaintiff need not even have a judgment, much less a lien, at the time of the challenged transfer" to be considered a creditor under the UVTA.  *Sanger v. Ahe Ahn*, 2019 U.S. Dist. LEXIS 178473, at *17-18 (N.D. Cal. Oct. 15, 2019) (citing *Potter v. All. United Ins. Co.*, 37 Cal. App. 5th 894, 909 (Cal. Ct. App. 2019)).  A plaintiff need only have a "claim," which is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  *Potter*, 37 Cal. App. 5th at 909 (quoting Cal. Civ. Code § 3439.01(b)).

Here, Ermilov transferred substantially all Treasury assets away from wallets controlled by the Overnight Finance protocol to wallets controlled by him alone.  Meyer Decl. ¶ 13.  He made these May 11 Removals mere hours before it became clear that a vote on the Proposal would be successful and OVN token holders would demand a distribution of the Treasury assets.  *Id.*  The Plaintiffs have a claim to the Treasury assets Ermilov transferred in the May 11 Removals.  *Id.*

Ermilov is the proper defendant for this claim.  Cal. Civ. Code § 3439.07(a)(3)(A) expressly permits injunctive relief against a transferee of a voidable transfer.  Therefore, while Ermilov may argue that the Treasury assets at some point belonged to an offshore entity he created—a claim the Plaintiffs dispute—Ermilov alone received the assets following the May 11 Removals.  As the transferee of the voidable transfer, he is a proper defendant for injunctive relief pursuant to the UVTA.

2.    *Breach of Contract*

"Under California law, a claim for breach of contract consists of four elements: (1) a contract, (2) the plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damages to the plaintiff from defendant's breach." *Smith v. Wells Fargo Bank, N.A.*, 809 F. Supp. 3d 922, 941 (N.D. Cal. 2025).

Here, the Named Plaintiffs and Ermilov entered into contracts when the Named Plaintiffs purchased OVN tokens from the system Ermilov created. In exchange, Ermilov promised to confer rights to vote on the distribution of Treasury assets and to obey the result of elections. Meyer Decl. ¶ 6.

Beginning on May 4, 2026, and finishing early on May 11, 2026, the holder of a majority of OVN tokens in existence voted to distribute the OVN Treasury to all Investors. *Id.* ¶ 12. Ermilov has demonstrated an intent to refuse to honor the vote or permit a distribution by frustrating the Investors' ability to vote on the distribution by stealing the assets himself. *Id.* ¶ 13. This breach caused the Named Plaintiffs to suffer damages because they cannot obtain the full Treasury assets.

**B.    The Plaintiffs Will Suffer Irreparable Harm Absent Relief**

The Plaintiffs will suffer irreparable harm if this Court does not enter a preliminary injunction. Ermilov's actions and recent asset transfers show that he intends to hide and steal the Treasury funds. Id. ¶¶ 13, 17. And Ermilov's use of the Zama Wallet demonstrates his intent to obscure records of his asset transfers. *Id.* ¶ 15.

Courts grant injunctive relief to prevent the dissipation of assets. *See, e.g., Fid. Nat'l Title Ins. Co. v. Castle*, 2011 U.S. Dist. LEXIS 135316, at *23 (N.D. Cal. Nov. 23, 2011). And district courts across the country have applied this basic rule in the cryptocurrency context, agreeing that the risk of irreparable harm is "likely in matters concerning fraudulent transfers

10

of cryptocurrency due to the risk of anonymous and speedy asset dissipation." *Jacobo v. Doe*, 2022 U.S. Dist. LEXIS 101504, at *15-16 (E.D. Cal. June 7, 2022); *see also Lagemann v. Spence*, 2019 U.S. Dist. LEXIS 171887, at *7 (S.D.N.Y. Jan. 24, 2019) (granting request for temporary restraining order and barring defendant from transferring assets from any cryptocurrency wallet or cryptocurrency trading account); *Heissenberg v. Doe*, 2021 U.S. Dist. LEXIS 257218, at *8-10 (S.D. Fla. Apr. 22, 2021) (finding irreparable harm to be likely if a temporary restraining order were not granted due to the "speed and potential anonymity of cryptocurrency transactions"); *Fed. Trade Comm'n v. Dluca*, 2018 U.S. Dist. LEXIS 237844 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 238558 (S.D. Fla. Mar. 12, 2018). As such, a preliminary injunction is appropriate to prevent the irreparable harm likely to be caused when the assets at issue involve cryptocurrency.

The Named Plaintiffs will suffer irreparable harm absent the relief sought. Without a preliminary injunction, the Named Plaintiffs are powerless to stop Ermilov from continuing to engage in improper conduct aimed at frustrating any future judgment in this case. Ermilov has already attempted to hide assets from the Named Plaintiffs by transferring assets to the Zama Wallet, which is designed to shield transaction details, and which further demonstrates the necessity of prompt intervention. Meyer Decl. ¶ 15.

Because cryptocurrency transactions are near instantaneous and difficult to trace, it is imperative to freeze the assets in their current wallets to maintain the status quo and avoid dissipation. *See Astrove v. Doe*, 2022 U.S. Dist. LEXIS 129067, at *11 (S.D. Fla. June 17, 2022) ("considering the speed with which cryptocurrency transactions are made, and the anonymity of those transactions, it is imperative to freeze the Assets Under Claim in the Destination Addresses to maintain the *status quo* and avoid dissipation of the money illegally taken from Plaintiff.").

11

Just as in the numerous other cases granting similar relief, an Order barring Ermilov from transferring assets from the Treasury Wallets and the New Wallet is necessary to prevent irreparable harm.

**C.**    The Balance of Equities Favors a Preliminary Injunction

The balance of equities favors the Plaintiffs because they would be severely prejudiced if Ermilov dissipates the funds wrongfully withheld from it.  *See Jacobo*, 2022 U.S. Dist. LEXIS 101504, at *17 ("withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court").  This is true because freezing Treasury assets will prevent Ermilov from hiding away assets that are not rightfully his in untraceable cryptocurrency accounts.  It will also maintain the status quo and allow the Investors to recover their valuable assets.

By contrast, Ermilov faces lesser prejudice if the Court grants injunctive relief.  He has no right to the assets he took in the May 11 Removals since he stole them from Investors.

As shown above, Ermilov faces reduced harm from freezing the Treasury Wallets and New Wallet assets, while the Plaintiffs will face irreparable harm without the ability to ever recover those assets.

**D.**    Public Interest Favors a Preliminary Injunction

A preliminary injunction here would serve the public interest, including preventing the conversion of the Named Plaintiffs' assets, protecting against the risk that such funds will be illegally transferred—including via a platform designed for that purpose—and by promoting the objective of the Financial Crimes Enforcement Network (FinCEN) by assuring the public that courts will protect investors' assets from bad actors and aid investors in their recovery of wrongfully withheld assets when they can be readily located and traced to specific locations

rather than waiting until after the funds have been transferred out to untraceable cryptocurrency accounts. *See, e.g., Jacobo*, 2022 U.S. Dist. LEXIS 101504, at \*18.

In contrast, there is little public interest in not freezing the assets in question. While arguably there is an interest in not attaching assets unnecessarily, the Named Plaintiffs have shown that Ermilov has no legal reason to remove the assets from the relevant wallets during the pendency of this dispute—in fact, doing so would be another breach of Ermilov's explicit promises to the Investors that he would hold the assets for their benefit and at their voting direction.

### III.    This Court Should Not Require the Named Plaintiffs to Post a Bond

The Ninth Circuit has recognized that "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)) (emphasis in original). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* The non-moving party holds the burden of proof that it will be harmed by the injunction. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (finding district court did not abuse its discretion where defendant "failed to request a bond or submit any evidence regarding [his] likely damages").

Here, there is no realistic likelihood of harm to Ermilov from enjoining his conduct to maintain the status quo. As of now, he has not suggested the existence of any evidence to the contrary.

13

## CONCLUSION

The Plaintiffs respectfully request that the Court grant their motion and any other relief it deems just.

Dated: Brooklyn, New York
          June 5, 2026

**WILL NEWMAN LAWYER PLLC**

/s/ Tara Q. Higgins

William H. Newman
(*appearing pro hac vice*)
Tara Q. Higgins
(*appearing pro hac vice*)
33 Nassau Avenue, Second Floor
Brooklyn, New York 11222
Phone: (718) 218-3360
Email: will@willnewmanlawyer.com
          tara@willnewmanlawyer.com

*Attorneys for the Named Plaintiffs and Proposed Class Counsel*

14